UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
UNITED STATES OF AMERICA                )
                                        )
        v.                              )        Criminal No. 19-10078-RWZ
                                        )
WILLIAM "RICK" SINGER,                  )
                                        )
        Defendant                       )
_____)

**GOVERNMENT'S SENTENCING MEMORANDUM AND
MOTION FOR DOWNWARD DEPARTURE PURSUANT TO SECTION 5K1.1**

The government respectfully submits this sentencing memorandum and motion, pursuant to Section 5K1.1 of the United States Sentencing Guidelines (the "Sentencing Guidelines"), in connection with the sentencing of defendant William "Rick" Singer.

Singer was the architect of a massive, decade-long scheme to use fraud and bribery to secure the admission of high school students to elite colleges and universities across the country. The unraveling of that scheme as part of the government's Operation Varsity Blues ultimately led to the conviction of more than 50 parents, coaches, and Singer associates. Sentences in the Varsity Blues cases have ranged from probation to 30 months in prison. As the orchestrator and leader of the scheme, the most culpable participant in it, and the defendant who profited from it the most, Singer deserves a sentence significantly exceeding the high end of that range. For years, he operated his college counseling and preparation business, "The Key," as well as an associated non-profit entity that purported to provide educational and self-enrichment programs for disadvantaged youth, The Key Worldwide Foundation ("KWF"), as a criminal enterprise, securing the admission of his clients' children to college by paying off test proctors and administrators to cheat on college entrance exams and bribing college athletic coaches and administrators to designate applicants as

athletic recruits based on fabricated credentials. As part of the scheme, Singer took in more than $25 million from his clients and paid bribes totaling more than $7 million. He transferred, spent, or otherwise used more than $15 million of his clients' money for his own benefit. Staggering in scope, Singer's scheme was also breathtaking in its audacity and the levels of deception it involved. His corruption and manipulation of others were practically limitless. Singer is far and away the most culpable of the Varsity Blues defendants – by orders of magnitude – and is therefore deserving of the longest sentence, notwithstanding his cooperation with the government's investigation, which as discussed below, was exceptionally valuable and, at the same time, plagued by missteps.

For these reasons, and in light of the additional considerations set forth below, the government respectfully recommends that Singer be sentenced to a term of 72 months in prison followed by 36 months of supervised release and that he be ordered to pay restitution to the Internal Revenue Service in the amount of $10,668,841 and to forfeit (a) specific assets traceable to his criminal offense, with a value in excess of $5.3 million[1] and (b) approximately $3.4 million in the form of a forfeiture money judgment (*see* ECF No. 87).

## I.      Overview of the Offense Conduct

It is difficult to overstate the scale and intricacy of Singer's scheme and nearly impossible to recount in detail every instance of fraud and bribery it involved. The Presentence Report ("PSR") provides an overview of the college entrance exam cheating and the fake athletic recruitment aspects of the scheme, describes how Singer explained the scheme to prospective clients, and sets forth examples of how the scheme worked in the instances of two families who

---

[1] The Court endorsed a final order of forfeiture for these specific assets on February 5, 2020 (ECF No. 49). Pursuant to Federal Rule of Criminal Procedure 32.2(b)(4)(B), the Court must also include the forfeiture order, directly or by reference, in the judgment.

agreed with Singer both to cheat on the ACT and/or SAT on behalf of their children and to secure their children's admission to college as phony athletic recruits. In addition to those forms of fraud and bribery, Singer and his co-conspirators falsified students' academic transcripts by paying third parties to take classes in their names and falsified their college applications by adding fake awards, athletic achievements, and other activities.

Singer and his co-conspirators concealed the scheme by funneling bribe and other payments through The Key or KWF, including by disguising payments as purported charitable contributions, which had the added benefit of allowing Singer's clients to improperly deduct the payments from their federal income taxes. Singer caused KWF to issue letters falsely attesting that the purported donations – which actually funded the bribe and other payments in furtherance of the scheme – would help "provide educational and self-enrichment programs to disadvantaged youth" and that "no goods or services were exchanged" for the money. In addition to allowing his co-conspirators to earn tax deductions on bribe payments, this method also allowed Singer to evade taxes by failing to report the payments as income, resulting in his failure to pay taxes totaling approximately $10 million on his criminal proceeds.

As discussed further below, upon being approached by law enforcement agents in September 2018, Singer agreed to cooperate with the government's investigation of his co-conspirators, including by making consensually recorded phone calls. At the same time, while feigning cooperation with the government's investigation, Singer covertly warned several of his co-conspirators about the investigation, including by having in-person meetings that he did not disclose to agents and by using a phone of which agents were not aware. In those communications, Singer instructed the co-conspirators to cease their criminal activity and told them that if they were to receive a phone call from him, it would likely be recorded and that they should therefore deny

participation in the scheme. In this way, Singer obstructed justice with respect to at least six families who either participated in the scheme or were planning to do so.

## II.    The Applicable Sentencing Guidelines

Singer pled guilty to a four-count Information charging him with conspiracy to commit racketeering, conspiracy to commit money laundering, obstruction of justice, and conspiracy to defraud the United States. The government submits, in accordance with the parties' plea agreement, that Singer's total offense level under the Sentencing Guidelines is 36. That calculation reflects a base offense level of 7 in accordance with Sections 2E1.1(a)(2) and 2B1.1(a)(1); a 22-level increase based on the gain from the offense; a 2-level increase pursuant to Section 2S1.1(b)(2)(B), because Singer was convicted under 18 U.S.C. § 1956; a 4-level increase based on Singer's role as an organizer/leader of the criminal activity; a 2-level increase under Section 2B1.1(10)(C), because the offense involved, and Singer intentionally engaged in or caused the conduct constituting, sophisticated means; a 2-level increase under Section 3C1.1, because Singer willfully obstructed the investigation of the instant offense of conviction; and a 3-level decrease pursuant to Section 3E1.1 for acceptance of responsibility. The resulting Guidelines sentencing range is 188 to 235 months.

The Probation Office calculates the Sentencing Guidelines differently, using the default racketeering offense level of 19, on the basis of its determination that there was no loss from the offense. As it has in all the Varsity Blues cases, Probation takes the position that there are no identifiable victims of the offense and no evidence that any individual or entity suffered an actual financial loss or that there was any reasonably foreseeable pecuniary harm to the testing agencies or universities impacted by the scheme. Probation therefore declines to apply an offense-level enhancement for gain as an alternative measure of loss. The government continues to disagree with

4

the Probation Office's conclusion, for the reasons it has previously elucidated in the related sentencings, including that of defendant John Vandemoer. *See United States v. John Vandemoer*, 19-CR-10079-RWZ. At the same time, the government recognizes that its position has been rejected by several sessions of this Court, including this one.

In the context of sentencing Singer, however, the logic the Probation Office has used to justify its position is particularly inapt. To take just one example from the government's objections to the PSR, Probation's view that there should be no enhancement based on the bribe amount suggests that Singer – who was involved in paying dozens upon dozens of bribes totaling millions of dollars, for both the test cheating and fraudulent athletic recruitment aspects of the scheme – is no more culpable than a parent who engaged in a single aspect of the scheme only once. While Probation agrees that Singer merits an enhancement for his aggravating role in the offense, Probation acknowledges that this adjustment "may not adequately capture the defendant's culpability and the monetary payments that he received over the duration of the conspiracy," and agrees with the government that the Court should consider the value of the payments Singer received and the bribes he paid "in evaluating the seriousness of the offense." PSR at 55, 56.

In any event, the government does not intend to further pursue its objections to the Probation Office's calculation – which results in a total offense level of 28 and a corresponding Guidelines sentencing range of 78 to 97 months – in light of its ultimate sentencing recommendation of 72 months.

## III.    Singer's Cooperation

While Singer agreed to cooperate with the government's investigation upon being approached by law enforcement agents, he did so reluctantly. He initially minimized his criminal conduct and failed to be completely truthful. During the early period of his cooperation, he not

only obstructed the investigation by tipping off at least six of his clients, as set forth above, but also failed to follow the government's instructions in other ways, including by deleting text messages and using an unauthorized cell phone.

Nevertheless, Singer's cooperation was also hugely significant. He agreed to a consensual wiretap of his phone that lasted several months, during which time he made hundreds of recorded calls at the government's direction with dozens of targets of the investigation. He also wore a wire to record several targets in person. Although he did not consistently follow the government's instructions in making them, the recordings permitted the government to prosecute dozens of parents and other co-conspirators who otherwise would have escaped charges because of the historical nature of their conduct and the difficulty of proving their criminal intent in the absence of recorded admissions.

Singer's historical cooperation was equally significant. Over the course of dozens of proffer sessions, he provided information on dozens of targets who had worked with him over the course of many years. The information Singer provided allowed the government to obtain search warrants for the email accounts of many parents and other co-conspirators, which resulted in the seizure of crucial evidence of their knowing and willful participation in the scheme. While it is difficult to attribute any specific plea to Singer, his decision to cooperate, and the evidence obtained as a result of his cooperation, unquestionably led to the guilty pleas of many parents, coaches, and other participants in the scheme.

Singer also agreed to forfeit specific assets traceable to his offense, with a value in excess of $5.3 million.[2] He further agreed to the entry of a forfeiture money judgment in the amount of

---

[2] The specific assets that Singer agreed to forfeit include: (a) two KWF bank accounts with a combined balance of $5,148,328.16; (b) KWF's investment in Jamtown, which the government disposed of for $100; (c) KWF's investment in Hauser Private Equity, for which the government

$3,429,970.87 – representing proceeds that he obtained as a result of his crime beyond the specific assets he agreed to forfeit – towards which he has already voluntarily paid $1,213,000.

In short, Singer's cooperation is unprecedented in scope in this District. At the same time, he obstructed the government's investigation, and the government ultimately chose not to call him as a witness at trial. While Singer's cooperation was both singularly valuable and singularly problematic, it warrants a significant downward departure from the low end of the Sentencing Guidelines range as calculated by the parties in their plea agreement.[3]

## IV.    Sentencing Recommendation

The government respectfully submits that the relevant factors under Section 3553(a) support the imposition of a meaningful sentence of incarceration that significantly exceeds those imposed on all other defendants sentenced in the Varsity Blues cases. Singer conceived and created the nationwide network of corrupt test proctors and administrators and college athletic coaches and administrators who helped implement his scheme and allowed it to succeed on the unprecedented scale that it did. His clients are certainly not the first to have cheated on college entrance exams, or to have paid corrupt coaches to give up recruitment slots, but Singer developed

---

recovered $131,714.96; and (d) KWF's investment in Versatile PhD, for which the government recovered $24,000. From these specific assets, the government has recovered a total of $5,304,143.12. The United States Marshals Service is in the process of disposing of the remaining specific assets, including KWF's interest in Swansea Football Club, Sharky's Restaurant Chain, Wham Tech, Inc., and Bluestone Partnership, which should result in additional recoveries.

[3] The government believes that its 72-month sentencing recommendation is appropriate even if the Court adopts the Probation Office's lower Guidelines calculation. As the Probation Office acknowledges, that calculation understates the seriousness of Singer's offense and his role in it. At the same time, the Court in imposing a sentence must take account of other factors that push in different directions, including the value of Singer's cooperation, his numerous missteps while cooperating, and the sentences imposed on others involved in his scheme. Taken together, these factors likewise support a sentence of 72 months, for all the reasons set forth in greater detail below.

a massive criminal enterprise purpose-built to execute such fraud on an industrial scale. And he created a market for his fraud, promoting the scheme to parents who – while eager and willing participants in the crime – would otherwise not have engaged in it on their own. He found demand in his wealthy and overprivileged clients, and helped to stoke it by convincing them that their children would not be admitted to the college of their choice without using his illicit services. Likewise, he established a network of corrupt test proctors and administrators who were willing to permit cheating to supplement their income, and college athletic coaches and administrators who were willing to sell their recruitment slots to bolster their fundraising efforts, their salaries, or both. All of these players were integral to the scheme's success, but without Singer, the scheme never would have happened. He was the architect and mastermind of a criminal enterprise that massively corrupted the integrity of the college admissions process – which already favors those with wealth and privilege – to a degree never before seen in this country.

Singer's culpability surpasses by leaps and bounds that of any other participant in his conspiracy, including participants who received significant prison sentences. The longest sentence to date – 30 months – was imposed on former Georgetown University tennis coach Gordon Ernst, who accepted nearly $3.5 million in bribes in exchange for falsely designating at least 22 students as tennis recruits. Ernst's conduct was egregious, and his sentence was, if anything, too light. But he was also just one coach at one university. Singer, on the other hand, bribed not just Ernst, but also coaches and administrators at *multiple* other universities – the University of Southern California, the University of California at Los Angeles, Yale University, Stanford University, the University of Texas at Austin, and Wake Forest University – to secure the admission of *dozens upon dozens* of applicants as phony athletic recruits. And, of course, that was only one part of Singer's scheme. Ernst had no involvement in the test cheating aspect of the scheme, which

involved fraudulent test centers Singer established in two states, where corrupt proctors and administrators on Singer's payroll falsified standardized test results for dozens more students. And Ernst likewise had no involvement in the other college applications Singer directed his staff to falsify, or the classes he directed them to take in the names of his clients' children, thereby inflating their academic transcripts. For these reasons, too, Singer merits a substantially longer sentence. Moreover, while Ernst accepted $3.5 million in bribes, Singer paid bribes totaling more than twice that amount. He also used more than $15 million of his clients' bribe money for his own benefit, lying to his co-conspirators in the process. Simply put, Singer's culpability stands in a league of its own. No other defendant's involvement was as extensive, nor was any co-conspirator's conduct more deceptive, corruption more deep-rooted, or lies more pervasive than Singer's. His sentence should, and must, reflect that singularity.

A significant sentence of imprisonment is necessary not only to reflect the nature and seriousness of Singer's offense and his degree of culpability as compared to other Varsity Blues defendants, but also for purposes of general deterrence. As the Varsity Blues cases have made clear, it was all too easy for Singer to corrupt the nation's college admissions process – on a massive scale for over a decade – by paying off those who were supposed to serve as gatekeepers and stewards of higher education in this country. It is difficult for universities, and criminal authorities, to detect and prevent such fraud. While Operation Varsity Blues has caused universities across the country to institute unprecedented reforms aimed at curtailing the abuses that occurred here, there is ultimately no surefire way to safeguard against criminal ingenuity. Loopholes – and those willing to exploit them for money – will remain. Singer's sentence should serve as a warning to anyone who might consider picking up where he left off.

Singer's sentence must also reflect the need for specific deterrence. Unlike many of the test proctors and administrators and college athletic coaches and administrators who will never again be in a position to commit the same crime, Singer might be. There is no licensing requirement for college admissions coaches, and no way to prevent Singer from returning to what he himself characterizes as a criminal "way of life," fueled by his desire to "win[] at all costs." Ex. B to Def.'s Sentencing Mem. (Def.'s Statement), ECF No. 90-1. Whether as a college admissions coach, or in some other post-prison endeavor, Singer will undoubtedly face circumstances and opportunities that require him to choose between right and wrong. A substantial term of incarceration is critical to remind him of the consequences of crossing that line, and necessary to protect society from his wrongdoing.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court sentence Singer to a term of imprisonment of 72 months, followed by 36 months of supervised release, and order (a) restitution to the Internal Revenue Service in the amount of $10,668,841, (b) forfeiture of specific assets with a value in excess of $5.3 million, and (c) a forfeiture money judgment in the amount of approximately $3.4 million.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By:    /s/ Leslie A. Wright
LESLIE A. WRIGHT
KRISTEN A. KEARNEY
STEPHEN E. FRANK
Assistant United States Attorneys

**<u>Certificate of Service</u>**

I hereby certify that this document was filed through the ECF system on December 28, 2022 and will be sent electronically to the registered participants identified on the Notice of Electronic Filing (NEF).

By:    */s/ Leslie A. Wright*
LESLIE A. WRIGHT
Assistant United States Attorney