1          UNITED STATES DISTRICT COURT
           DISTRICT OF MASSACHUSETTS
2

3   UNITED STATES OF AMERICA,        )
                      Plaintiff,     )
4                                    )
    vs.                              )   No. 19-CR-10078-RWZ
5                                    )
    WILLIAM RICK SINGER,             )
6                      Defendant.    )

7

8

9

10
                  BEFORE THE HONORABLE RYA W. ZOBEL
11                UNITED STATES DISTRICT COURT JUDGE
                          SENTENCING HEARING
12

13

14

15      John Joseph Moakley United States Courthouse
                      Courtroom No. 12
16                    One Courthouse Way
                  Boston, Massachusetts 02210
17

18                    January 4, 2023
                         2:18 p.m.
19

20

21
                 Kathleen Mullen Silva, RPR, CRR
22                   Official Court Reporter
        John Joseph Moakley United States Courthouse
23               One Courthouse Way, Room 7209
                  Boston, Massachusetts 02210
24               E-mail: kathysilva@verizon.net

25      Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2

 3              United States Attorney's Office

 4              AUSA Stephen E. Frank

 5              AUSA Kristen A. Kearney

 6              AUSA Leslie Wright

 7              John Joseph Moakley U.S. Courthouse

 8              Boston, Massachusetts 02210

 9              617.748.3204

10              for the Government

11

12              Candice Fields Law PC

13              Candice L. Fields, Esq.

14              400 Capitol Mall, Suite 1620

15              Sacramento, California 95814

16              916.414.8050.

17              and

18              Freeman Mathis & Gary, LLP

19              Andrew Neil Hartzell, Esq.

20              60 State Street, 6th Floor

21              Boston, Massachusetts 02109

22              617.963.5966

23              for Defendant

24

25
```

<pre>
 1                    P R O C E E D I N G S
 2              THE CLERK:  All rise.
 3              THE COURT:  Please be seated.
 4              THE CLERK:  This is United States vs. William Singer
 5     and this is Criminal 19-10078.
 6              Can I ask counsel, please, to identify themselves for
 7     the record.
 8              MR. FRANK:  Good afternoon, Your Honor.  Stephen
 9     Frank, Kristen Kearney and Leslie Wright for the United States.
10              THE COURT:  Wait a minute.  Okay.  I'm sorry.
11              MR. FRANK:  Good afternoon.  Stephen Frank, Kristen
12     Kearney and Leslie Wright for the United States.
13              THE COURT:  Got you.
14              MS. KEARNEY:  Good afternoon, Your Honor.  Kristen
15     Kearney.
16              THE COURT:  I'm sorry?
17              MS. KEARNEY:  Kristen Kearney for the United States.
18              MS. WRIGHT:  And Leslie Wright.  Good afternoon, Your
19     Honor.
20              THE COURT:  I'm sorry?
21              MS. WRIGHT:  Leslie Wright.  Good afternoon.
22              THE COURT:  Leslie Wright.  You're the tail end of the
23     group that represents the government.  There's two names ahead
24     of you, but it's okay.
25              MR. FRANK:  We like to think of ourselves as the
</pre>

1  vanguard, Your Honor.

2          THE COURT:  All right.  Now for the defendant.

3          MS. FIELDS:  Good afternoon, Your Honor.  Candace

4  Fields on behalf of the defendant, William Rick Singer.

5          MR. HARTZELL:  Good afternoon, Your Honor.  Neil

6  Hartzell on behalf of Mr. Singer.

7          THE COURT:  Okay.  There were some very few objections

8  to the presentence report.  I think for the most part probation

9  has responded to them and changed the order and the wording of

10 some of these.

11         Objection number 1, however, is overruled.  I agree

12 with the judges who had previously ruled on this issue and I

13 don't think it makes sense to have two sets of rules about

14 them.

15         And objection number 2, I believe probation has

16 already addressed and made the correction that counsel wanted.

17         MR. FRANK:  Yes, Your Honor.

18         THE COURT:  And objection -- that was the government's

19 objections.

20         Now, the defendant's objection number one, that has

21 also already been addressed by probation in response to the

22 suggestion.

23         MS. FIELDS:  Yes, Your Honor.

24         THE COURT:  Objection number two, I'm not sure if I

25 need to make any changes in the text with respect to that.

1            MS. FIELDS:  No, Your Honor.

2            THE COURT:  So that one is okay.

3            Objection number 3 also I don't think requires any

4     change.

5            MS. FIELDS:  Agreed.

6            THE COURT:  Objection number 4, similarly, I note it,

7     but no change.

8            MS. FIELDS:  That's fine, Your Honor.  Thank you.

9            THE COURT:  Objection number 5, I guess the question

10    is whether the response is okay for the defendant.

11           MS. FIELDS:  It's fine.

12           THE COURT:  Okay?

13           MS. FIELDS:  Yes.

14           THE COURT:  Then objection numbers 6, 7 and 8 have

15    also been addressed by probation by providing amendments.

16           MS. FIELDS:  Yes.

17           THE COURT:  And number 9, similarly, although I

18    must -- I had trouble finding the report that was referred to,

19    but I found it.

20           Then objection number 10 has been addressed, as has

21    eleven by means of amendments to the earlier language.

22           Similarly, objection numbers 12, 13, 14, 15 have all

23    been amended as requested by counsel who made the objection.

24    Correct?

25           MS. FIELDS:  Agreed.

1    THE COURT:  Number 16 also has been addressed, as has

2  17 and 18.  And 19, I'm not sure that I understand the

3  objection.

4    MS. FIELDS:  Your Honor, we're satisfied.

5    THE COURT:  I'm sorry?

6    MS. FIELDS:  We're satisfied, Your Honor.

7    THE COURT:  Number 19?

8    MS. FIELDS:  Yes.

9    THE COURT:  You want --

10    THE CLERK:  Can you speak into the mic, please.  Can

11  you just pull it over.

12    MS. FIELDS:  Very well.

13    Your Honor, we don't need to pursue that objection at

14  this time.

15    THE COURT:  No objection.

16    MS. FIELDS:  That's fine, Your Honor.  Thank you.

17    THE COURT:  That's 19.  And 20.  And 21, whatever the

18  conditions are, will come up later.  It's not part of this

19  document really.

20    MS. FIELDS:  Understood.

21    THE COURT:  And I think that's it.

22    MS. FIELDS:  Yes.

23    THE COURT:  So the objections, to the extent that

24  we've discussed them, are sustained and corrections will be

25  made or have been made.  I think mostly have been made already.

1          So the ultimate result of all of this is that

2    probation has -- this is one of the longest reports I've ever

3    had so I had trouble finding anything on it.

4          The probation report determines that the offense level

5    is 28, that the Criminal History Category is I, that the

6    guideline provisions are 78 to 97 months.  These are guideline

7    provisions.  This is not what likely will be the end result.

8    Supervised release one to three years.  Probation is not

9    available.

10          And I think we're not talking about any fines because

11    we're talking entirely about restitution.  And those amounts I

12    do not know, except to the extent that I've allowed them, and

13    counsel likely for the government will have to run them past

14    the defendant and then let me sign whatever I need to sign with

15    respect to that.  There will be a special assessment of $400

16    and that's it.

17          Is there anything else that we need to do preparatory

18    to the rest of this?

19          MR. FRANK:  No, Your Honor.  And I think restitution

20    is not disputed at this point.  So the court can order

21    restitution as part of its imposition of sentence today.

22          THE COURT:  Right.  And you will have the amount to

23    the extent it exceeds what I have already ordered?

24          MR. FRANK:  I have the amount.

25          THE COURT:  Okay.  So I will hear from the government

concerning its recommendation, and then I will hear from the

defendant, and then I will hear from the defendant himself, and

then we'll continue.

MR. FRANK:  Thank you, Your Honor.

Your Honor, we are asking for a sentence of 72 months

in prison plus 36 months of supervised release.

THE COURT:  Excuse me for interrupting so soon.  Does

that take into account the defendant's work, if you will, since

his arrest?

MR. FRANK:  It absolutely does, Your Honor.  As you

know, the government calculated the guidelines differently from

probation, but we agree with probation in its conclusion in the

revised presentence report that the guidelines, as probation

calculates them, may substantially understate the seriousness

of the offense and the defendant's role in the offense.

We are asking for 72 months, as I'll speak about

momentarily, because we think that is the right sentence.

Regardless of how the guidelines are calculated, when the court

takes into account, on the one hand, the seriousness of this

offense, the gravity of the offense, the defendant's role as

the mastermind of this long-running and nationwide scheme on

the one hand, the similarly situated or the other defendants in

this scheme and the sentences that were imposed upon them, as

well as the defendant's cooperation, the good and the bad that

went along with that cooperation, we think when all of those

factors are considered, we come out at 72 months, and we think

that is the right sentence.  We're not asking for that sentence

because the defendant is asking for time served or a

non-incarcerative sentence and we're hoping the court will meet

in the middle.  We're asking for 72 months because we think

when all of those --

THE COURT:  72 or 78?

MR. FRANK:  72, because we think when all of those

factors are taken into account, that is the right sentence.

There are four principal points that I'd like to

address.

First is the singularity of this crime.

Second is the need to recognize the defendant's

unparalleled cooperation, the significance of that cooperation,

but also the problems with that cooperation.

Third, the need for the sentence imposed to reflect

just punishment and also to be appropriate relative to the

sentences imposed on other defendants in this case.

And finally, the need for deterrence, both specific

and, even more important, general.

THE COURT:  What was the first?

MR. FRANK:  The singularity of this crime.

Your Honor, this defendant was responsible for the

most massive fraud ever perpetrated on the higher education

system in the United States.  The scheme lasted for

approximately a decade.  Over that time dozens of students were
admitted to multiple elite colleges and universities as fake
athletic recruits based on bribery and based on fraud.

The scheme stretched from coast to coast, from Yale
and Georgetown and Wake Forest University on the East Coast, to
the University of Texas, and on the West Coast to Stanford, the
University of Southern California and UCLA.

Athletic department insiders, coaches, and high-level
administrators were corrupted at each of those schools.

THE COURT:  What happened to the students who were
admitted as a result of these events?

MR. FRANK:  Your Honor, at each of these universities
there were internal investigations after our scheme -- our
investigation came to light, and the universities reached
different conclusions for different students depending on a
variety of factors, including, I think most importantly in most
of those cases, whether they found evidence that the students
knew about the fraud or whether, as in many cases, the students
did not know about the fraud.  So some students no longer
attended those universities.  Some students' degrees were
revoked.  Other students were allowed to graduate.

Your Honor, the scheme, in addition to the insiders at
these universities, involved parents from across the United
States from right here in Massachusetts all the way to
California.  And it involved parents around the world, from

1    Canada to Hong Kong.  Tens of millions of dollars were

2    involved.

3         A fake charity was set up to launder the proceeds from

4    the scheme, to pay the bribes, and to allow the conspirators to

5    evade taxes.  And there was not just fraud involved in athletic

6    recruitment as part of this scheme.  The defendant orchestrated

7    cheating on a massive and unprecedented scale on standardized

8    college admission tests, the SAT and the ACT.

9         Test centers were set up in two different states

10   stacked by corrupt administrators and corrupt test proctors.

11   Parents agreed to have their children play dumb so that they

12   could earn extra time on those exams and allow the scheme to

13   work.  There was also cheating on the actual college

14   applications, fake honors and awards, fake extracurricular

15   activities, even falsification of the student's race and

16   ethnicity.

17        It was a scheme that was breathtaking in scale and in

18   its audacity.  It has literally become the stuff of books and

19   made-for-TV movies.  There were Hollywood actors involved in

20   the scheme as co-conspirators.  And now there are Hollywood

21   actors who play participants in the scheme in those movies that

22   are made for television.

23        There were dozens and dozens of conspirators, but at

24   the end, Your Honor, without this defendant, without Rick

25   Singer coming up with the scheme, masterminding the scheme,

orchestrating the scheme, it would never have happened.

There were very real victims of this scheme. Not just the universities, whose reputations were tarnished, whose staff was corrupted, who spent millions of dollars on internal investigations that could have been spent on scholarships. And the court has received in connection with this sentencing and other sentencings, and other judges of this court have received in connection with other sentencings submissions from several of those universities about the effect that it has had on those universities and the very real costs that they incurred in investigating the scheme and in dealing with it. And I'm happy to hand some of those up if the court does not have them all.

Other victims included the applicants, real applicants, real student athletes who devoted their lives to succeeding in sports at the highest level, but who were passed over and deprived of admission slots for less qualified students because of the fraud and bribery that were a part of this scheme.

And across the country, Your Honor, millions of students and their parents, who work hard to play by the rules, who have faith in the system, that faith was destroyed by the corruption that they may have at some points suspected but that no one could have dreamed would be as brazen as it was in this scheme.

THE COURT: The corruption you're talking about that

1  is relevant to this case was entirely in California?

2          MR. FRANK:  No, it was not entirely in California,

3  Your Honor.

4          THE COURT:  Other universities all across the country

5  were affected by it?

6          MR. FRANK:  Georgetown University --

7          THE COURT:  Yale I remember was.

8          MR. FRANK:  -- Yale University, Wake Forest

9  University, the University of Texas, and then on the West Coast

10  Stanford and USC and UCLA.  It literally stretched from coast

11  to coast and in between.

12          All of those people and those institutions, the

13  universities, the students who were deprived of actual

14  admission spots, and the students who were deprived of hope

15  that they could play on a level playing field, all of them were

16  victims of this man and of his dozens of co-conspirators.  This

17  crime was singular in the history of the United States.

18          Second, notwithstanding his central, indispensable

19  role in this scheme and the unparalleled nature of the conduct,

20  the defendant's cooperation was also unparalleled and that has

21  to be recognized.  We've described it in some detail in our

22  submission to the court, but literally dozens of parents and

23  coaches and other co-conspirators were prosecuted because of

24  the cooperation that Rick Singer provided.  The consensual

25  wiretap of his phone that he authorized, the in-person meetings

1    to which he wore a wire and recorded.

2            THE COURT:  Were there any such prosecutions in states

3    other than Massachusetts?

4            MR. FRANK:  All of the prosecutions arising out of the

5    scheme were in this district, Your Honor.

6            THE COURT:  All here?

7            MR. FRANK:  Correct.

8            THE COURT:  How come?

9            MR. FRANK:  Because this office investigated and

10   prosecuted the scheme over years, Your Honor, and this is where

11   we brought the prosecution.

12           And in addition to wearing a wire and authorizing a

13   wire on his phone, Your Honor, the defendant sat for hours of

14   interviews with the government, provided voluminous information

15   on his co-conspirators and was prepared to testify at trial if

16   called to do so.  All of that is uniquely significant and

17   worthy of recognition in imposing sentence.

18           At the same time, his cooperation was uniquely

19   problematic.  He has pled guilty to obstructing the

20   investigation and that obstruction was very real and had real

21   consequences.  He tipped off at least six individuals to the

22   government's investigation.  And there were cases that as a

23   result could not be brought.  So it was obstruction that had

24   real impact.  It was unparalleled cooperation, but it was

25   cooperation that was also singularly problematic.

1    Your Honor, next I'd like to speak about the

2  consequences for other defendants in this scheme.  Almost every

3  single participant in this scheme, other than some of the other

4  cooperators, but almost every single participant has served

5  time in prison, including some who did cooperate with the

6  government's investigation.

7    We've discussed at length in our sentencing memorandum

8  that in our view the next most culpable participant was a man

9  named Gordon Ernst, the tennis coach at Georgetown University.

10  If I could just briefly speak for a minute to compare Gordon

11  Ernst, the next most culpable participant with this defendant,

12  Rick Singer, I think you'll see it underscores why we're asking

13  for the sentence of 72 months that we are asking the court to

14  impose.  Because Gordon Ernst, who received a sentence from

15  Judge Talwani of 30 months, was nowhere near as culpable as

16  this defendant.  Gordon Ernst accepted three and a half million

17  dollars in bribes.  This defendant oversaw a scheme in which

18  parents paid 25 million dollars that they intended to be used

19  as bribes.  Gordon Ernst was one coach at one university.  The

20  defendant oversaw a scheme at all of those universities I

21  mentioned from coast to coast involving multiple coaches at

22  multiple elite universities.

23    Gordon Ernst was responsible for the fraudulent

24  admission of not quite two dozen students.  This defendant

25  oversaw a scheme that involved not just those two dozen

1  students but dozens of other students who were fraudulently

2  admitted to other universities.

3         THE COURT:  When you say he oversaw them, what does

4  that mean?

5         MR. FRANK:  He was the mastermind of this scheme.  He

6  was the architect.

7         THE COURT:  Did he deal directly with any of the

8  students or was it simply that he had --

9         MR. FRANK:  With all of them, Your Honor.

10        THE COURT:  -- this business that had the information

11 that they needed?

12        MR. FRANK:  He dealt directly with each and every one,

13 Your Honor.

14        And Gordon Ernst, of course, had absolutely no

15 involvement in whole portions of the scheme:  The test

16 cheating, the standardized test cheating, Gordon Ernst had zero

17 involvement in that.  The cheating on college applications,

18 falsifying those applications, Gordon Ernst had no involvement

19 in that.  He was involved in one aspect of the scheme at one

20 university in contrast to this defendant.  And the sentence

21 imposed on him was 30 months.

22        Even with this defendant's cooperation, and especially

23 given the problematic nature of that cooperation, his sentence

24 needs to be significantly higher than what Judge Talwani

25 imposed in that case, because without him, without him, this

massive historic national scheme would never have happened.  He
is the architect of it.  He is the face of this fraud.  He
provided the opportunity for corruption into which other
participants succumbed.  Some of the co-conspirators in the
scheme, people like Gordon Ernst, were corrupt on their own.
Gordon Ernst did some fraud deals one on one with students that
didn't involve Rick Singer.  But for other participants, from
coaches to parents, prior to meeting Rick Singer they led a
law-abiding life.  And it was this defendant who corrupted
them.  They did so voluntarily.  They chose to involve
themselves in bribery and fraud.  They made those choices and
they have to live with the consequences of them, including
prison, but it was this defendant who provided them with that
opportunity.

And lastly, Your Honor, that brings us to my fourth
point, which is the need for deterrence, two forms of
deterrence, specific deterrence and general deterrence.

As to specific deterrence, I've already spoken about
it.  The defendant got caught and he went on to obstruct the
government's investigation.  The scheme lasted roughly a
decade.  Over that time, the defendant made the choice again
and again and again to recommit to his fraud.  And over that
time, he found even more complex and less detectable ways to
perfect his scheme, to cheat the system and to get away with
it, which is part of the reason he got away with it for so

1  long.

2         THE COURT:  Cheat which system?

3         MR. FRANK:  The college admission system, the

4  standardized testing system.

5         The defendant is 62 years old.  He's still young

6  enough and healthy enough that he will, whatever sentence the

7  court imposes, get out of jail and have plenty of opportunity

8  to reoffend.  Maybe not in precisely the same way but in some

9  other way.  So he needs to be deterred from ever making the

10 wrong choice again.  And this country, and whatever part of it

11 he chooses to reside in, needs to be protected from him making

12 that wrong choice.

13        But I think, Your Honor, even more important than

14 specific deterrence is general deterrence.  Your Honor, right

15 now, the eyes of the country are on this courtroom and on the

16 sentence that Your Honor will impose in this case.  Every major

17 news organization in the country is covering it.  If this court

18 does not impose a significant sentence today, it will send a

19 devastating message that fraud pays and obstruction of justice

20 pays.  It will empower those who would pick up where Rick

21 Singer left off, whether on a small scale or on a big one.

22        The University of California at Los Angeles, the vice

23 provost of that university has submitted a letter to this court

24 in which she wrote, "If criminal fraud in the admissions

25 process is not sufficiently punished, it will be undeterred."

1          THE COURT:  When was that letter sent?  Because I do

2     not recall seeing it among my many letters.

3          MR. FRANK:  I can hand it up to Your Honor.  It's

4     dated June 13 of 2022 and I have a copy.

5          THE COURT:  Thank you.

6          MR. FRANK:  It's also attached to the presentence --

7          THE COURT:  I don't think I have this letter.

8          MR. FRANK:  It's attached to the back of the

9     presentence report.

10          THE COURT:  I'm sorry?

11          MR. FRANK:  I believe it is also attached -- appended

12     to the presentence report.  At least it was appended to my

13     copy.

14          THE COURT:  I don't think so.  The tail of my package

15     has the sentencing recommendation by probation.

16          Do you have it?

17          PROBATION:  I have another copy, Your Honor.  It

18     should have been sent at the time of the final disclosure of

19     the presentence report.  And I apologize.

20          THE COURT:  Don't worry about it.  I now have it.

21          MR. FRANK:  Your Honor, there were other letters

22     submitted to this session in connection with another sentencing

23     and to other sessions of the court.  I have copies of all of

24     those if Your Honor would like those in connection with other

25     sentencings.

1          THE COURT:  They were sent to me?

2          MR. FRANK:  One was sent to Your Honor in connection

3     with the sentencing a couple years ago of John Vandemoer,

4     another defendant in the scheme.

5          THE COURT:  I have a number of letters that the

6     defendant made available to me, but they are not this kind of

7     letter.  They were relatives.

8          MR. FRANK:  Okay.

9          MS. FIELDS:  I have not received a copy of the letters

10    that are being referred to, Your Honor.

11         MR. FRANK:  I'm happy to hand up copies and provide

12    them to counsel.

13         THE COURT:  Why don't you finish and then before we go

14    on, we'll look and see what you have and what I don't have, and

15    then we can collect -- although I'm not exactly sure how much

16    of this I can read before we finish today.

17         MR. FRANK:  And they're all generally of the same --

18    they have the same message, Your Honor.  And that message is

19    that these institutions, the educational testing service, the

20    college board, the ACT, the universities, they were all harmed

21    in very real ways by this scheme.  Their reputations were

22    harmed.  Faith in their services and their offerings was harmed

23    and they incurred very real costs, millions of dollars in total

24    spent on internal investigations, in improving their systems.

25    That's money that could have been spent on scholarships.  It's

1    money that could have been spent on academic research.  Instead

2    it was spent dealing with the consequences of this scheme.

3         Your Honor, we believe it's important to recognize and

4    reward cooperation because without cooperation, we would not be

5    able to bring many criminal cases.  And we believe that the

6    sentence we're asking for recognizes and appropriately rewards

7    the defendant's cooperation in this case.  But it also bears

8    noting that this cooperation was problematic and that people

9    are walking free because of that, and that we ultimately chose

10   not to call this defendant as a witness at trial.

11        And it also bears noting how unique this crime was,

12   how historic, how massive it was.  Regardless of the value of

13   the cooperation, which was significant, we believe that this

14   man needs to go to jail for a meaningful length of time.  We

15   believe that the right sentence is 72 months, that that is a

16   just sentence, that that is a sentence no greater than

17   necessary to accomplish all the purposes of sentencing that

18   I've talked about today.  Thank you, Your Honor, and I'm happy

19   to answer whatever questions you might have.

20        THE COURT:  Okay.  Ms. Fields.

21        MS. FIELDS:  Your Honor, in the government's own

22   words, Rick Singer's cooperation was hugely significant,

23   exceptionally valuable and unprecedented in scope in this

24   district.  The parties agree --

25        THE COURT:  But they've sort of said that about what

1  he did before then, too.

2            MS. FIELDS:  That is true, Your Honor.

3            The parties agree Mr. Singer gave investigators the

4  information and evidence they needed to prosecute and convict

5  more than 50 individuals.  First, he revealed the scope of the

6  scheme over many years.  Then he went to work gathering

7  evidence the government concedes they could not obtain without

8  his help.

9            He agreed to a consensual wiretap that lasted several

10  months.  Under supervision, he made thousands of recorded calls

11  to obtain admissions and he even wore wire to record in-person

12  meetings which subjected him to significant personal risk.

13            Additionally, he conducted controlled bank

14  transactions and met with, or at least spoke to, investigators

15  on virtually a daily basis.

16            In essence, Mr. Singer did whatever was necessary to

17  assist the government in their investigation.  His efforts

18  contributed to the successful prosecution of dozens of

19  co-conspirators who the government concedes would have

20  otherwise escaped charges.

21            In addition to his cooperation, Your Honor, Mr. Singer

22  has forfeited assets worth more than 5.3 million dollars and he

23  has voluntarily paid an additional 1. --

24            THE COURT:  He has forfeited or they were restitution

25  amounts?

1          MS. FIELDS:  Those amounts were forfeited, and it is

2     my understanding that they will form the basis for restitution

3     to the IRS.

4          THE COURT:  Well, that's the difference, isn't it?

5          MS. FIELDS:  Yes, Your Honor.

6          He has also voluntarily paid an additional 1.2 million

7     dollars toward a money judgment that is anticipated.

8          THE COURT:  But that too is treated as part of what

9     has to be repaid.

10         MS. FIELDS:  That is part of the terms of the plea

11    agreement under the category of forfeiture.

12         THE COURT:  I know.  But the basis for it has to do

13    with moneys he received and shouldn't have received and now

14    he's paying back.

15         MS. FIELDS:  Absolutely correct, Your Honor.

16         He's also agreed to make restitution, as I indicated,

17    to the IRS in excess of 10 million dollars.  All totaled, he

18    has committed to turn over 19 million dollars to federal

19    agencies, money that he owes.

20         After waiving indictment and being the first to plead

21    guilty because he cooperated, Mr. Singer's case has trailed his

22    co-conspirators and his sentencing has been delayed for nearly

23    four years.  During that period of time, he has been supervised

24    without incident.  These facts are undisputed.

25         So why then does the government compare Mr. Singer to

this other defendant, former Georgetown coach, Gordon Ernst?
Mr. Ernst never cooperated at all.  In fact, after he was
charged, he delayed admitting guilt for two and a half years.
Therefore, Mr. Singer and Coach Ernst aren't similarly situated
at all.  And yet the government suggests that Mr. Singer's
sentence should be almost two and a half times more than that
of Mr. Ernst.

THE COURT:  Who is the person you're talking about who
got the good deal?

MS. FIELDS:  Well, I don't know that 30 months is a
good deal but Coach Gordon Ernst.

THE COURT:  What did he allegedly do?

MS. FIELDS:  As the prosecution mentioned in their
statement to the court, Your Honor, Mr. Ernst was a coach and
he engaged in --

THE COURT:  Is he the guy from Yale?

MS. FIELDS:  He's Georgetown, Your Honor.

THE COURT:  Georgetown.

MS. FIELDS:  He engaged in his own bribe scheme and he
also was a co-conspirator of Mr. Singer's.

The government justifies its request for a sentence of
72 months for Mr. Singer by magnifying his culpability compared
to that of Coach Ernst.  However, as I just mentioned, both
engaged in schemes both with and also to the exclusion of each
other, both are responsible for millions of dollars of bribes

resulting in loss to the IRS, and both gamed the college admission system, although Mr. Ernst did it as an insider violating his duty as a university employee.

The difference in culpability between these two defendants does not justify a sentence for Mr. Singer that is more than twice that of Coach Ernst. Rather, the mitigation in Mr. Singer's case is of a scale so substantial as to warrant a less severe sentence.

By asking for the sentence the government requests while yielding to probation's calculation of the applicable guideline range, in effect the government is seeking only a six-month below guideline sentence for their super cooperator Rick Singer. That is not just an injustice to this defendant but bad for justice generally because short shrift for singularly valuable cooperation won't motivate others to assist the government in the future.

Yes, Mr. Singer made some regretted mistakes early on in the form of self reported obstruction but the government chose to continue using him and benefitted immensely as a result. The significant nationwide reforms at colleges and universities for which the U.S. Attorney's Office claims credit would not have occurred without Mr. Singer's participation. The investigation only received the notoriety it did in books, tabloids, film, because dozens of influential and sometimes celebrity defendants were prosecuted and that only occurred

1  because of Rick Singer.

2         For the reasons previously briefed, Your Honor, and as

3  stated here, Mr. Singer deserves far greater credit for his

4  cooperation than the government concedes.

5         THE COURT:  Mr. Singer, do you wish to say anything

6  before I impose sentence?

7         THE DEFENDANT:  Yes, Your Honor.

8         THE COURT:  By all means, do that.  If you wish to sit

9  down while you do it, that's fine, too.  It's up to you.  Just

10  be sure you speak into the microphone.

11         THE DEFENDANT:  Yes, ma'am.

12         Your Honor, when I stood here in 2019, you asked me if

13  I committed the acts that the government charged me with and I

14  said yes.  I am responsible for my actions and my crimes.  The

15  fraudulent testing scheme, bribing of university officials,

16  lying on students' applications and profiles, I did all of it.

17         I want to list the people I hurt so that they know I

18  recognize the pain I caused them.  I hope they will hear my

19  apology.

20         First, to the students who were admitted to schools

21  under false pretenses.  Those students were intelligent and

22  deserving of more integrity than I showed them.

23         Second, the institutions that were involved, I know I

24  caused them great embarrassment in the public eye.

25         Third, to those I brought into the scheme, I

1  apologize.  I am the most culpable.

2      Fourth, to the students and families I worked with

3  over decades who received legitimate services, I apologize to

4  them for tarnishing their memories or in any way casting any

5  doubt about their college admission.

6      And then finally, I apologize to my parents, my

7  siblings, my son, and other relatives and to the friends of

8  mine for the embarrassment and the shame that I caused them.

9      I'm sorry to all of you and hope you hear my apology.

10      THE COURT:  Thank you.

11      THE CLERK:  He's not done.

12      THE DEFENDANT:  Your Honor --

13      THE CLERK:  He has more.

14      THE COURT:  Oh.

15      THE DEFENDANT:  I apologize.  I'm sorry.

16      THE COURT:  You go right ahead.  Sorry.

17      THE DEFENDANT:  Sorry.

18      THE COURT:  It sounded like an ending, but there are

19  some music pieces like that, too.

20      THE DEFENDANT:  Yes, ma'am.

21      All my life I just wanted to help kids and their

22  families improve their lives.  Besides parenting my son, my

23  most fulfilling memories come from the numerous opportunities

24  I've been given to make a difference in other persons' lives.

25  However, despite my passion to help others, I lost my ethical

values and have so much regret.  To be frank, I'm ashamed of myself.

I want to take a moment to address my obstruction. Very early in my cooperation, I did stop six people from implicating themselves.  I have no excuse for this because I knew I had committed to assisting the government at that point. I just felt so bad for some of the people I was gathering evidence against that I compromised the investigation.  Then because I felt so guilty for deceiving the government, I immediately told them about my illegal actions.  From that moment forward I have tried my best to comply with all the wishes of the government and I hope my missteps do not taint the critical work I performed at great personal cost.  I want to apologize to the FBI agents and the prosecutors who worked diligently on the entire investigation.

When I look back at my life, Your Honor, and as I have done each day since I was first approached by the government, I see that my moral compass was warped by the lessons my father taught me about competition.  I embraced his belief that embellishing or even lying to win was acceptable as long as there was victory.  I should have known better.  It's all my fault.

I've spent over four years now being counseled, mentored and coached by family and friends and recently even professionals who have helped me reflect on how I used to be.

Winning and keeping score used to be paramount.  I've worked
very hard to take the score out of everything I do.  I don't
want to be how I was when winning was everything and doing it
the right way didn't matter.  Now I've learned to take a step
back and not be triggered like before.  I can see the
difference between how I was and how I am now and always want
to be.  I've learned how to use my strong self discipline to
adhere to being a good, honest and legitimate person.

All I want to do is live a life that is deeper and
more enriched by devoting myself to making a difference in
other people's lives.  I know the government has expressed
concerns that I might relapse, but I've developed the personal
skills not to.  I know surrounded by good people dedicated to
good causes that I can and I will be a law-abiding citizen.

To that end, I've spent the last four years
volunteering and developing a curriculum and a program that can
be customized to serve both youth and adults in under-resourced
communities.  Just recently I've been given an opportunity to
personally implement this program in a poor community in
Arkansas and I'm really hoping to be able to help them.

Your Honor, I can't take back the things I did for
which I'm very, very sorry.  But I will work every day going
forward to make a positive impact in other people's lives.  I
am prepared to accept whatever sentence the court believes is
appropriate.

1          Thank you, Your Honor.

2          THE COURT:  Well, it was a serious business, all

3     right, with huge amounts of money involved, large amounts of

4     dishonesty by various participants, not just you.  And likely

5     harmful to each set of the players, as we learned at the very

6     beginning of this hearing today.  So, I mean, it's a serious

7     case.  It's a difficult case certainly for me, and I'm sure for

8     you as well.

9          I don't think there's any doubt that there has to be

10    some period of incarceration.  This is not a case in which I

11    could simply sentence you to probation or supervised release

12    without some period of time.  And that has to do with the fact

13    that it was such a large venture with such large amounts of

14    money that it lasted for an extraordinarily long period of time

15    given this kind of arrangement that tends to come and go fairly

16    rapidly.

17         So with all of that in mind, I sentence you to a term

18    of imprisonment of 42 months, a period of supervised release to

19    follow that of three years, and I don't know about additional

20    restitution.  I have no numbers for any of that.

21         MR. FRANK:  The restitution number, Your Honor, I

22    don't believe is disputed, is $10,668,841.

23         THE COURT:  But he already has paid some of that?

24         MR. FRANK:  No.  That's restitution to the IRS, Your

25    Honor, in connection with the 371 conspiracy to defraud.

1      THE COURT:  No cents on this one?  Zero cents?

2      MR. FRANK:  Zero cents.

3      THE COURT:  And this goes to --

4      MR. FRANK:  To the IRS.

5      THE COURT:  IRS only.

6      MR. FRANK:  The court has previously entered an order

7  of forfeiture of specific assets, that's at docket --

8      THE COURT:  Of 1 million something.

9      MR. FRANK:  -- 49.  That was assets that have a value

10 of approximately 5.3 million dollars.

11     THE COURT:  Okay.

12     MR. FRANK:  And we have also filed a proposed motion

13 for entry of a forfeiture money judgment.  That's at docket 87.

14     THE COURT:  I do have that.

15     MR. FRANK:  We would ask the court to enter that order

16 now.  It's in the amount of 3.4 million dollars.

17     THE COURT:  This case has more papers than any I have

18 seen in a long time.

19     THE CLERK:  I put a little clip on it.  Here it is.  I

20 put a little sticky on it.

21     THE COURT:  So if there's no objection, I assume, to

22 my signing the order of forfeiture money judgment?

23     MS. FIELDS:  No objection, Your Honor.

24     THE COURT:  Okay.  Let me just do that so it's done.

25     Okay.  That is done.

```
 1          Lisa, just let me give it to you so it doesn't go
 2    away.
 3          THE CLERK:  Yup.
 4          THE COURT:  Thank you.
 5          Now, you said the 10 million to the IRS.  Is it simply
 6    an order of restitution or what?
 7          MR. FRANK:  Yes.  The restitution that would be
 8    ordered as part of --
 9          THE COURT:  But I don't have those papers yet.
10          MR. FRANK:  It would be entered as part of Your
11    Honor's judgment.
12          THE COURT:  So you have the numbers?
13          THE CLERK:  Yes, I wrote it down.  So I'll put it in
14    the judgment.
15          THE COURT:  That will be part of the judgment.  Okay.
16          MR. FRANK:  Thank you, Your Honor.
17          THE COURT:  Does that take care of the money piece of
18    it?
19          MR. FRANK:  It does, Your Honor.
20          THE COURT:  Okay.  So as I said, I sentence you to a
21    term of imprisonment for a period of -- I think I said 42
22    months.
23          THE CLERK:  Yes.
24          MR. FRANK:  Yes, Your Honor.
25          THE COURT:  And a period of supervised release to
```

1  follow equal to three years.

2       And there are conditions to the period of supervised

3  release which, if I could find, I would tell you about.

4       I don't know why this case has so much paper.

5       PROBATION:  Your Honor, they're listed on pages 51 and

6  52 of the presentence report.

7       THE COURT:  Presentence reports also are getting

8  longer and longer.

9       So there are a number of different kinds of conditions

10  of supervised release.  One is called the mandatory conditions,

11  and they include that you shall not commit any other offenses,

12  either local, state or federal, that you shall not unlawfully

13  possess any controlled substances, that you shall submit -- no.

14  That you shall cooperate in the collection of a DNA sample as

15  directed by probation.

16       We're not talking about the drug one, are we?

17       PROBATION:  Yes, Your Honor.  I would recommend that

18  the drug testing conditions be suspended because he has no

19  history of substance abuse.

20       THE COURT:  Okay.  That's number 4 -- no, number 3 on

21  your list.

22       PROBATION:  Number 3, yes.

23       THE COURT:  I skipped over it.

24       PROBATION:  What?

25       THE COURT:  I did skip over it.

1    PROBATION:  Oh, yes.

2    THE COURT:  Then there a number of special conditions

3    that you need to follow.  They include that you shall pay the

4    balance of any fine or restitution or the amounts we just

5    talked about according to a court-ordered repayment schedule,

6    which will come in due course.  It will be probably worked out

7    between your lawyer and the government.  And then we will enter

8    it as an order of the court.

9    You shall not incur any new credit charges or open

10   additional lines of credit without the approval of the

11   Probation Office while any financial obligations remain unpaid,

12   that is, financial obligations pursuant to this judgment.

13   You shall provide to the Probation Office access to

14   any requested financial information that they require, and

15   understand that that may be shared with the financial

16   litigation unit at the U.S. Attorney's Office.

17   I have no community service, no home detention.  You

18   must pay to the United States a special assessment of $400,

19   that is $100 for each of the counts with which you have been

20   accused.  It's a statutory requirement.  I have no discretion

21   over that at all.

22   You have -- there was a plea agreement, right, in

23   which he gave up his rights of appeal?

24   PROBATION:  Yes, your Honor.

25   MR. FRANK:  Yes, Your Honor.

1          THE COURT:  So there's no right to appeal left.

2          Now, the only other question, I assume that you would

3   prefer to report to the institution to be designated by the

4   Bureau of Prisons?

5          MS. FIELDS:  Yes, Your Honor.  With a request for a

6   recommendation for the minimum security camp at Pensacola.

7          THE COURT:  Okay.  We will ask for that.

8          And that takes about six weeks?

9          PROBATION:  Yes, Your Honor.

10          MS. FIELDS:  Your Honor, may I make a secondary

11   request for Otisville, again, the minimum security?

12          THE COURT:  So what's the date you want?

13          THE CLERK:  I was looking at -- what about February

14   27?

15          MS. FIELDS:  I'm sorry?

16          THE CLERK:  How's February 27?

17          THE DEFENDANT:  That's fine.

18          THE COURT:  You need to get there before noon.

19          MS. FIELDS:  May we please confirm the camp is what

20   I'm requesting?

21          THE CLERK:  Yes.  So one recommendation, Pensacola,

22   and then Otisville.

23          MS. FIELDS:  Otisville.  The camp at each.

24          THE CLERK:  The camp?

25          MS. FIELDS:  Yes, please.

1          THE CLERK:  Where's that at?

2          MS. FIELDS:  Otisville is in New York.  Second choice.

3     Thank you.

4          THE CLERK:  Okay.

5          THE COURT:  That, I think, takes care of everything I

6     need to do.

7          Is there anything else from probation?

8          PROBATION:  No, Your Honor.

9          THE COURT:  From the government?

10         MR. FRANK:  Nothing, Your Honor.  Thank you.

11         THE COURT:  Ms. Fields?

12         MS. FIELDS:  No, Your Honor.  Thank you.

13         THE COURT:  Thank you all.  And I'm sorry where we

14    are, but I certainly do wish all of you well, including the

15    defendant.  Thank you.

16         MR. FRANK:  Thank you.

17         MS. FIELDS:  Thank you.

18         MR. FRANK:  Thank you, Your Honor.

19         THE COURT:  Court is in recess.

20    (Proceedings adjourned at 3:12 p.m.)

21

22

23

24

25

1               C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS    )

6

7

8            I certify that the foregoing is a correct transcript

9    from the record of proceedings taken January 4, 2022 in the

10   above-entitled matter to the best of my skill and ability.

11

12

13

14

15   /s/ Kathleen Mullen Silva                    1/13/23

16

17   Kathleen Mullen Silva, RPR, CRR              Date
     Official Court Reporter
18

19

20

21

22

23

24

25